[No. 5853.   Decided January 13, 1906.]

ALFRED LEESON, *Respondent,* v. SAW-MILL PHOENIX *et al.,*
*Appellants.*[1]

MASTER AND SERVANT—NEGLIGENCE—INJURY TO SERVANT FROM DE-
FECTIVE LATHE — ASSUMPTION OF RISKS — PROMISE TO REPAIR — LIA-
BILITY OF MASTER.  An operator of a turning lathe is, by the master's
promise to repair, relieved from the assumption of risks by reason of
a broken socket, where it appears that the superintendent told him
to take the socket to the office and it would be repaired, which he
did several times, but returned with it and used it unrepaired upon
an urgent request of the foreman, upon his promise to repair it as
soon as the job was completed, and where the danger was not so
imminent that a workman of ordinary prudence would have regarded
it so hazardous as to have refused.

DAMAGES—FOR PERSONAL INJURIES—EXCESSIVE VERDICT—REMIS-
SION.  A verdict of $5,500 for personal injuries sustained by an op-
erator of a turning lathe, a married man forty-seven years of age,
and capable of earning $3,50 per day, is excessive, and should re-
duced to $3,500, where the only result of the accident was hernia,
and testimony of the experts was to the effect that a great majority
of people afflicted with this disorder are able to carry on their regular
occupations with the aid of trusses, and that a large per cent of such
cases are permanently cured by an operation, and where the plaintiff
was otherwise in normal health and testified that he had since the
injury done some light work.

Appeal from a judgment of the superior court for Spo-
kane county, Warren, J., entered February 27, 1905, upon
the verdict of a jury rendered in favor of the plaintiff for
$5,500, for personal injuries sustained by a turner through
a defective lathe.  Affirmed on condition of the remission of
$2,000.

1Reported in 83 Pac. 891.

*R. J. Danson* and *Post, Avery & Higgins,* for appellants.
*Graves & Graves* and *B. H. Kizer,* for respondent.

Root, J.—Respondent instituted this action to recover damages for an injury sustained while operating a lathe, in the wood turning department of a mill owned by the defendant mill company. The facts were about as follows: There was, in said department, a small lathe capable of turning a stick about four feet in length, and a large lathe to be used upon sticks much longer. The accident occurred while the respondent was operating the latter. Respondent, Alfred Leeson, was the wood turner for appellant. Defendant William R. Roy was the superintendent in charge of the mill at the time of the accident; and appellant John Peterson was the foreman. The accident was alleged to have been caused by the use of a broken socket which holds the rest which steadies the chisel held by the operator in turning a stick.

There are two of these sockets, somewhat in the shape of the letter "L." The longer side of the socket rests on the timbers forming the table, and is fastened down solid by a bolt, the head of which catches in a groove extending down the middle of this brace or socket, and is held down by a crosspiece under the timbers of the table. Extending from the upright arm of one of these braces or sockets to the other is a parallel bar forming the rest. By reason of the groove in the brace the distance of the rest from the timber in the lathe can be regulated according to the size of the piece being turned, but when it is set it is perfectly solid. The timber to be turned, a square piece of wood, being fixed in the lathe, power is applied and the clamps and the stick they hold are made to revolve with great rapidity toward the rest.

The turner takes a position in front of the rest, holding a chisel or gouge, which, with its handle, is about two feet long, in a slanting position and resting upon the rest. The blade is turned upward and toward the revolving timber, so that as it comes in contact with the chisel the corners are cut off

and the timber is made round, beaded, fluted, or otherwise shaped as the operator desires. The handle projects below the rest, and is grasped there by both hands of the turner. The rest is necessary to this work, and must be perfectly solid, since if it were loose or wobbly the chisel could not be held firmly, and might catch in the revolving timber, with probable injury to the person holding it.

At the time of the accident, one of the sockets or braces was defective in that a piece had been broken out of one side of the arm resting on the table next to the groove, so that the head of the bolt would not catch and hold the brace. This brace or socket had been broken for some time; but respondent continued to use it without complaint until the day of the accident, or as he maintains, two or three days before the accident, when he called both Mr. Roy's and Mr. Peterson's attention to it. During this time he fastened the socket down by some sort of a wooden contrivance arranged by himself. When he called Mr. Roy's attention to it, Mr. Roy told him to take the socket to the office, and he would have it fixed. This Leeson did in a few minutes, but later on in the morning he brought it back and used it on another job.

When the superintendent went to the office to get the rest to have it fixed, that same morning, he found it gone, although he had seen it there a little while before. Respondent claims to have returned it and again taken it after having been told by Peterson that he must get out a certain order at once, which he could only do on the large lathe. Peterson swears that he did not tell Leeson to get the rest to do the work, and he did not promise to have it repaired. Leeson proceeded to use the broken socket, although he believed there was some danger in so doing. It was while Leeson was using the lathe, after having brought back the socket the second time, that the accident is alleged to have occurred. It is claimed that by reason of the rest being loose, the handle of the chisel was thrown back, hitting appellant in the abdomen and rupturing him. It was about noon at the time, and appellant sat down

and did not begin work until after dinner. He finished the rest of the five timbers which he had begun to turn that day, and continued working for three or four days before he went to see a doctor. He did not complain of being hurt to Mr. Roy till a day or two after the accident. He continued to work at the mill for a few days after he had seen the doctor. Plaintiff is an expert wood turner, a married man forty-seven years old, and was earning $3.50 per day. The answer, by way of affirmative defense, alleges that whatever injury said plaintiff sustained, was caused by his own negligent act; and that he, by his own negligence, contribued to and caused said injury; and that said plaintiff knew any and all danger which he would and did incur in performing said labor, and voluntarily assumed any and all risk in performing said work.

A trial was had before a jury, which brought in a verdict of $5,500 for the plaintiff. Challenges to the sufficiency of the evidence and motions for judgment were made by appellants, at the close of respondent's case, and at the end of all the evidence, all of which were overruled except as to Roy. A motion for a new trial was duly made, and denied. The court having sustained a motion for a nonsuit as to the defendant William R. Roy, judgment of dismissal was entered as to him. Judgment was entered against defendants Saw-Mill Phoenix and John Peterson, for $5,500, together with cost incurred. From this judgment, said defendants appeal to this court.

Appellants assign error upon the action of the court in giving certain instructions, and in refusing to give others requested by them. Some of the instructions complained of were faulty or defective; but we do not believe the giving of any of them was, or was capable of being, prejudicial to appellants. Some of those requested by appellants were correct statements of law, but inapplicable to this case. Others referred to matters properly covered by the instructions given by the court. We think that the charge given fairly covered

the case and that no reversible error was committed either in the giving or refusing of instructions.

Error is assigned upon the denial of the motions made for judgment at the close of respondent's case and at the termination of all the evidence. There is no doubt but that respondent would be held to have assumed the risk of the danger that occasioned his injury, were it not that he was working, as he maintains, under a promise to repair. In fact, respondent's counsel do not claim otherwise. The pivotal question is as to whether or not respondent was working under a promise to repair such as would take the case out of the ordinary rule of assumed risk. We think that he was. The superintendent promised to have the socket repaired or replaced by a new one as soon as respondent finished the job he was then working on. But before this repairing was done, another piece of work was presented. The foreman told him that it must be done immediately. It was necessary, or at least respondent believed it was necessary, to use the large lathe and the broken socket to perform this work. Respondent testified that the foreman told him to get and use this socket, and it would be repaired when the job was completed, and he did so very reluctantly. His evidence on this point, however, is somewhat confused and not very satisfactory. We think, however, that from all of the evidence the jury could legally have found that both the foreman and superintendent promised to repair or replace this defective appliance, and that respondent continued to work with the same, expecting that it would soon be repaired or replaced.

It is urged, however, by appellants that the promise does not bring the case within the exception to the rule for the reason that they did not promise to make the repairs or change until a definite time thereafter—to wit until the job was finished that respondent was working upon, and hence that the promise was not effective as to the piece of work he was then engaged upon. We cannot uphold this contention. Neither of the jobs mentioned required much time—one but

a few hours, the other about one day. Believing that the socket would be repaired or replaced within a few days, he was justified in trying to work with the broken appliance unless the danger from it was so imminent that a workman of ordinary prudence would have regarded it too hazardous and have refused, for that reason, to so use it. He admits that he knew there was some danger to be apprehended, but did not regard injury therefrom as probable. We cannot say, as a matter of law, that the danger was so apparent and imminent that he should have declined to use the broken socket notwithstanding the promise to repair or replace. Ordinarily intelligent, reasonable, fairminded men might properly differ upon this proposition; hence, it was a question for the jury. That body having found the issue in favor of respondent and the trial court having upheld the verdict, we feel bound thereby.

Appellants insist that the verdict is excessive. We think the contention must be sustained. Respondent placed upon the witness stand two physicians. One of these was Dr. Baker, who, among other things, stated as follows:

"I think as a rule the majority of men with ruptures are fairly comfortable with a truss, others again are not comfortable. . . . I don't know about the percentage but I think the majority are able to engage in physical exercise and carry on some light occupation."

And upon cross-examination, testified: "As applied to the risk to live, if the rupture is constantly kept within the abdominal walls by a truss, there is practically little danger of any serious complication as far as life is concerned."

The other was Dr. Catterson, who upon direct examination was asked the following question, and answered as indicated:

"Q. About what probability of recovery would there be? Are you able to state it any more definitely than you have? A. Oh, I should judge that at least 75 per cent of these cases are permanently cured. Many of them are cured for the time being but in a year or two the rupture returns again;

the tissue gives way and they have the same condition back again."

And upon cross-examination, answered questions as follows:

"Q.    About what length of times does it take a patient to recover from an operation of this kind?   A. Oh, a patient usually gets up in two weeks or three weeks; but it is usually necessary for them to keep pretty quiet for six weeks or two months before they are able to be around very much or to do work.   Q. And after that if there is a recovery, they are substantially in a normal condition, are they not?   A. Yes, a very good condition. . . .   Q. And I will ask you if, in your judgment, an operation could be successfully performed upon him?   A. I think so. . . .   Q. I will ask you if, in your judgment, you could not take this man and perform an operation upon him, and make him practically in normal condition, in your judgment?   A. Yes, so far as I can see; I see no reason why it could not be done. . . . Q. Isn't it a fact as shown by the medical authorities, that one-sixth of the population are suffering with rupture?   A. Yes, I think that is correct. . . .   Q. Doctor, this operation, assuming that it was all successful, and so on, what would it cost for nurses, medicines, doctors and hospital fees and so on?   A. Oh, somewhere in the neighborhood of two or three hundred dollars; between two and three hundred dollars maybe."

The appellants placed upon the witness stand one Dr. Essig.  At the close of this doctor's testimony the counsel for respondent admitted in open court that another medical expert whom the appellants were intending to call as a witness would, if called, testify in substance the same as Dr. Essig. And said counsel for respondent also in open court made the following statement: "I am willing to take Dr. Essig's testimony as correct.  I think he exaggerated a little, but I am willing to take his testimony as stating the medical facts in the case if it will save you any time."  Dr. Essig, among other things, testified as follows:

"He has a rupture of the right side, what we call an inguinal hernia; that is a hernia that passes through a ring,

what we call the internal ring, . . . Q. Now, I will ask you to state what he can use, if anything, for the purpose of enabling him to work? A. He can wear a truss, or he can have an operation performed upon it to make a permanent cure. The truss, of course, is something that supports and prevents it from coming into the canal at all. Q. What was his general physical condition? A. Good. After the examination, I asked him if there was anything else. He said absolutely nothing excepting that. Q. What was his appearance as to being in normal condition in flesh and all? A. He appears to be in a healthy condition, aside from the condition of the rings. Q. I will ask you state to the jury, from the examination which you made and from your talk with him, whether in your judgment he can wear a truss and would then be able to work and perform the ordinary occupation which he follows of a turner? A. I discovered no reason why he might not do it; none whatever. Q. I will ask you what percentage of people the medical authorities show to be suffering with rupture? A. In perhaps about 16⅔ per cent of the people that you meet upon the street where there is no family history of hernia preceding—I mean in the ancestry— have hernias, or about 22 ½ per cent of people whose ancestors have had hernia have it; about 16⅔ per cent of those who give no ancestral history have it. In other words, about 16⅔ per cent of the people that you meet in common every day life are afflicted with hernia. . . . Q. I will ask you to state to the jury whether or not in your opinion as a surgeon, a skillful surgeon could perform a successful operation upon this plaintiff and cure him of this rupture, make him fully cured? A. I discovered no reason whatever to indicate otherwise. Q. About how long a time would it take from the time of the operation? A. I make it a rule in my own cases to keep them in bed about three weeks after an operation. I keep them longer after hernia operations than others because you are trying to close a natural canal in it and you want to be sure that your adhesions are all perfect; so I usually keep them three weeks. A great many keep them about two weeks. Foley, who does more operations than any man in the United States, and possibly than any man living, keeps them two weeks. Q. About how long would it take him to recover if the operation was successful? A. Well, full recovery is a question that has to be determined

by the lapse of some time. We occasionally have a relapse after an operation. If the patient gets on without relapse, without a recurrence of it for a year, without getting down again, we consider that the cure is permanent. But inside of six weeks a case without any complication arising in it, ought to be able to resume work. Q. And perform any ordinary labor, such as turning? A. Yes, any labor that he might ever have performed previously. Q. Now, then, I will ask you, in your judgment, without this operating, with the use of a truss, if this man can perform the usual avocation of a turner? A. Any properly fitted truss ought to enable that man to perform any labor that he has ever performed heretofore. . . . The probabilities are that there has always been that weak condition upon both sides, because it shows itself at this side of the ring, a feebly closed right. . . . Q. I mean if he has got a truss on it don't hurt him? A. Not necessarily, no, sir; because thousands wear them and work hard every day. Thousands have them and work without feeling them. . . . A. I wouldn't charge him less than $250. Q. What other expenses would he have? A. His hospital expenses. Q. How much would they be? A. Three weeks. . . . That would cost him anywhere from $8 a week up to $15, $18, $20, $25 or $30 depending on the kind of room he thought he ought to have. He would rest as well in the $8 bed as he would in the $30 bed. . . . A. Well, sir, the average death rate in 10,000 up to 1900 is nine-tenths of 1 per cent and it has improved a little recently. . . . Q. There is, however, a risk attending the operation? A. There is no operation that is free from risk. . . . Q. All that you can say, or the most skillful of you, is that the probabilities are that a cure will be effected and a recovery had? A. Yes, that is all any man can say."

All of the doctors testified that respondent was in a healthy normal condition with the exception of the hernia. Respondent, himself, testified that since quitting work in the mill he had engaged a small part of the time in some occupations not requiring much physical exertion. The evidence given by the medical witnesses and by respondent, and in his behalf, does not in our opinion show an injury justifying an award of damages in the sum found by the jury. We believe that

the sum of $3,500 would be very ample compensation, and much more in accord with what is right in the premises. An excessive verdict in a case like this is not only an injustice to the defendants, but it is a menace to the welfare of the state, and should not be upheld.

The case will be remanded with the following instructions: If respondent, within thirty days from the filing of the remittitur in the superior court, shall file a relinquishment of so much of the judgment as exceeds the sum of thirty-five hundred dollars, the judgment in said sum will stand affirmed. If such relinquishment is not so filed within said time, the superior court is directed to enter an order granting a new trial.   Costs to appellant.

MOUNT, C. J., CROW, and HADLEY, JJ., concur.

FULLERTON and RUDKIN, JJ., concur in the result.